(61 South. 795.)

No. 19,100.

WATSON et al. v. J. F. BALL BRO. LUMBER CO., Limited, et al.

MERCER et ux. v. J. F. BALL BRO. LUMBER CO., Limited.

(March 31, 1913. On Rehearing, April 28, 1913.)

*(Syllabus by the Court.)*

1. EVIDENCE (§ 539½*)—EXPERT EVIDENCE—QUALIFICATION.

This court finds it impossible to understand a witness who, knowing that the side of a transverse cut through a railroad embankment, which has been excavated with practically no slope and without bracing, has caved in of its own motion, killing one and injuring another of the workmen in the bottom of the cut, testifies that the method of excavation was perfectly safe, and equally impossible to understand the point of view from which it can be contended that a man who has worked on railroads for 20 years, without having learned that the sides of a ditch may be kept from caving in by bracing, and who appears to be unable to appreciate that possibility when it is explained to him, can be an expert in the science of excavation and a competent person to put in charge of such work.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2350–2352; Dec. Dig. § 539½.*]

2. MASTER AND SERVANT (§ 217*)—INJURIES TO SERVANT—KNOWLEDGE OF DANGER.

It is the duty of a person who assumes to direct the excavation of a cut through a railroad embankment to know the character, with reference to its coherency and to the intrinsic and extrinsic conditions affecting it, of the material of which the embankment is composed, and to know how, properly, to provide against the danger of its disintegration whilst the work is in progress; and no such knowledge is to be expected of ignorant laborers—men and boys—employed to do such work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

Appeal from Thirteenth Judicial District Court, Parish of Grant; W. F. Blackman, Judge.

Action by Oliver C. Watson, for minor Carl L. Watson, against the J. F. Ball Bro. Lumber Company, Limited, and others, and Mose Eli Mercer and wife against the same defendants. Judgment for defendants, and plaintiffs Watson appeal. Reversed, and judgment for Carl L. Watson for $6,000.

Julius T. Long, of Winnfield, for appellants. Blackman & Overton, of Alexandria, for appellees.

### Statement of the Case.

MONROE, J. The two suits, the titles of which are given above, were instituted for the recovery of damages for personal injuries sustained by the minor Watson (who has since attained majority and made himself a party hereto), and resulting in the death of the minor son of the plaintiffs, Mercer, by reason of an accident, which plaintiffs attribute to the fault of the defendants, and which occurred while the minors were engaged in certain work in the employ, as plaintiffs allege, of said defendants. It is admitted that the Iron Mountain Lumber Company is not a judicial person, but is merely a name under which J. F. Ball Bro. Lumber Company, Limited, transacts part of its business; and the evidence shows that while the Natchez, Ball & Shreveport Railway Company is incorporated, and appears to be the owner of a couple of logging roads which extend from different mills of the J. F. Ball Bro. Lumber Company into the woods, said corporation is practically owned and is wholly controlled by the same persons who own and control said mills; that practically its entire business consists in the handling of the logs and lumber used and produced by said mills; and that all of the employés who work upon or for said railroad or corporation and receive salaries or wages are paid by the J. F. Ball Bro. Lumber Company, Limited, through the Iron Mountain Lumber Company, Limited. The answers of said railroad company and of said J. F. Ball Bro. Lumber Company, Limited, do not specifically deny that the minors, Watson and Mercer, were employed by them, but allege, each of them:

"That if it will be found, upon the trial, that plaintiffs' son was in the employ of respondent, and * * * was injured while so employed, the injuries were due to his own fault * * * and to the fault * * * of his fellow servants, and to the risks and hazards known and patent, obvious, and apparent * * * and ordinarily incident to whatever employment, if any, plaintiffs' son was engaged in," etc.

There was judgment in the district court in favor of the defendants, and the Watsons alone have appealed; but as their case was consolidated with that of the Mercers, for the purposes of the trial, and the testimony was taken for the purposes of both cases, both titles have been retained.

It appears from the evidence that the railroad which runs from the mill of the defendant lumber company at Pollock into the woods has a "fill" or embankment, say, 150 feet in length, with a base of, say, 54 feet, and that it extends across a little valley between two pine-wooded hills, and that the wooden culvert beneath said "fill" or embankment, whereby the waters coming down the valley were allowed to continue on their course, having rotted, it was found advisable to replace it, and, in order to do so, to make a transverse cut through the embankment from the crown down to the bottom of the ditch to and into the natural surface on which the embankment rests, and from and in which the old culvert was to be removed and the new one put in its place; the extreme depth of the cut to be made being about 14 feet. According to the testimony of defendants' witnesses by whom the work was directed, the intention was to make the cut 12 feet wide at the top and 10 feet wide at the bottom, thus giving each of the sides a slope of 1 foot in 14; and it is possible that such a slope was given and that, being so slight, it escaped observation, a ma-

jority of the witnesses having testified that to them the sides appeared to be perpendicular. When the work of excavation had progressed to a depth of some five feet, there was left an arch or natural bridge extending from one side of the cut to the other, upon which, as still further progress was made and it became impracticable to throw it at once to the top, the dirt was first thrown, and from which it was "relayed" or rethrown upon the surface, near the edges of the cut, whence it was again removed (so as to keep it from filling in again, and so as to make the necessary room) by laborers who were stationed there for that purpose. All of the witnesses agree that the arch was used for the purpose stated, but those who were in charge of the work disclaim having had any such purpose, or, in fact, any purpose, in view in leaving it there, and say that it was left by the laborers of their own accord, probably because the earth or material of which it was composed was found to be hard to handle, though it does not appear that it was harder than any other of the material that was excavated. As the arch extended from one wall of the cut to the other, its length was, of course, measured by the width of the cut; its width was about three feet, and its depth in the middle was about one foot, though somewhat greater near the walls of the cut. The work of excavation appears to have been practically finished on Monday evening (May 16, 1910); and on the following day no work was done because it rained all day, not a driving rain or a pouring rain, but a steady rain, which may have begun, for aught that we find in the testimony, during Monday night and have continued until Tuesday night, and which is described by some of the witnesses as a "season," which is defined by them (or one of· them) to be a rain from which ground that is broken up will get "good wet."

On Wednesday morning (May 18th) the work of putting in the new culvert was begun, and it consisted, first, of laying across the bottom of the cut 12x12 inch timbers, 8 feet long, to serve as "mud sills," upon which there were laid, parallel with the cut, other 12x12 inch timbers in two lines, 6 feet apart, each line consisting of two (or possibly three) of the timbers, the one on top of the other, and each line forming one of the sides or walls of the culvert, which was thus made 6 feet wide inside, 8 feet outside, and three feet deep, and was eventually covered with, say, 2x12 or 4x12 inch planking. While the work thus referred to was in progress, however, the arch fell and interrupted it, and the laborers were set to work to remove the material of which it had been composed; and about an hour and a half later, while they were so engaged, a portion of one side of the cut caved in upon them, crushing or smothering the life out of the minor Mercer, who was a boy about 15 years old, half burying the minor Watson, who was about, or past 20 years of age, and inflicting upon him the injuries here complained of, and injuring several other of the laborers. Watson's head and shoulders being visible, attention was at once attracted to him, and it was only while his fellow workmen were engaged in digging him out, and after a lapse of perhaps 10 or 15 minutes, that Mercer's head or body was discovered, and he was then dead. Watson was crushed down against the timbers that were to be used in the construction of the culvert and was badly bruised generally; but his most serious injuries consisted of the crushing of one of his testicles to such an extent that it was necessary to remove it, and the dislocation of one of his knee joints, which, as a result, has been left so that it continues to become dislocated on slight provocation. He seems, however, to have recovered his physical strength and to have gone back to work again within a couple of months, or, per-

haps, earlier, and at the time of the trial was not disabled, save in so far as the loss of his testicle may be considered to have operated to produce that result. Upon that point, two physicians have testified that, in their opinions, he has been deprived of the power of procreation, and that the effect of his loss, upon his mind, will be prejudicial to his energy and his ambition. Two other physicians have given testimony of a contrary import.

The wall of the cut caved in from the top, and the part that fell was from 10 to 15 feet long, between 2 and 3 feet thick, and about 5 feet deep, coming down to about or near the point from which the end of the arch had projected. Some of the witnesses testify that they had felt some doubts about the arch and had rather been on the lookout, lest it should fall, but none of them appear to have felt any apprehension about the wall of the cut; the consensus of their testimony being that they never thought of it, most of them, when their attention was called to it, assigning as a reason that the earth of which the walls were composed seemed to be hard, and also when their attention was called to it that they took it for granted that the foreman in charge would see that it was safe.

There were four persons representing defendants who may be said, in one way or another, to have been in charge of the work, to wit, B. F. Lewis, who was once "woods foreman" of J. F. Ball Bro. Lumber Company, Limited, and superintendent and general manager of the Natchez, Ball & Shreveport Railroad; A. G. Cobb, who was "general foreman and road master" of the railroad company; Gus. Futrell, who was section foreman; and Will Futrell, who was "straw boss" under Gus. Futrell—all of whom received their pay from the Iron Mountain Lumber Company and never received it from any other source.

132 La.—26

It appears that the roadbed on the embankment here in question had sunk at about the point where the cut was subsequently made, and, 10 or 15 days before the work of replacing the culvert was begun, Mr. Cobb, acting under the instructions of Mr. Lewis, had repaired it by first digging out the earth from between the ties, then raising the ties, with the rails on them, and supporting them with timbers laid under their ends, and then filling in again, and tamping, etc., which work was completed and the supporting timbers removed a few days before the accident. Our conclusion, from Mr. Lewis' testimony, is that his attention was attracted to the condition of the culvert by the sinking of the roadbed above it, and that, attributing the one to the other, he concluded, whilst remedying the effect, that he would also remedy the cause of the trouble and rebuild the culvert. Thus he testifies as follows:

"Q. You stated that it [the culvert] needed repairs; were there any indications on the top showing that it needed repairs? A. There was nothing to indicate on the top of the fill. Q. There were some timbers placed under the rails on the top? A. Yes, sir. Q. What was the size of those timbers? A. 12x12; 12x12, 32 feet long. Q. Who placed those timbers under the tracks at this point? A. I had Mr. Cobb to place them under. Q. For what purpose did you put those timbers under the track? A. To make safe and protect the engine, cars, and crew in passing over the dump in case the culvert should give way. Q. Were the trains passing over it at that time? A. Yes, sir. * * * Q. How long did they [the timbers] remain in there before Mr. Cobb came to repair the culvert? A. Some 10 or 15 days. * * * Q. How long did those timbers remain under the ties? A. I think they were taken out about the time that the excavation was being completed, about Saturday or Monday."

Mr. Lewis further testifies that he instructed Mr. Cobb to make the cut 12 feet wide at the top and to "cut it down so as to have just enough room in the bottom to put in the culvert." We gather from his further testimony that his first employment in connection with a railroad was in 1904, during which year, from the spring until

October, he was superintendent of the "Arkansas & Southeastern," a logging road, but "with regular equipment," and was engaged in repairing and constructing. During that period, he put a culvert in a fill that was probably 25 feet high, and he says:

"We started up at the crown * * * with about 30 feet and brought it down to about 12 feet."

Being asked why he gave it that slope, he replied:

"Because it was so sandy; it would not stand."

His subsequent experience appears to have been altogether with logging roads (with logging equipments, as we infer), and he had no occasion to put in culverts at a depth greater than, say, 8 feet.

Mr. Cobb began work as a laborer or section hand on a railroad at the age of 16, and is now 34 years old. After four years' experience he became a section foreman, or "extra gang" foreman, and so continued, most of the time on logging roads, until some three years prior to the date of the accident here in question when he was made general foreman and roadmaster of the defendants' logging road. He had never before repaired or replaced a culvert in a cut so deep as that here in question. He had never had occasion to brace the sides of any cut or ditch in order to keep them from falling in, and had never seen such a thing done, and he testified that in his opinion it would have been impracticable to have applied a brace or braces to the sides of the cut in question without getting down into the cut and thereby exposing one's self to the danger that was to be avoided. He was asked whether he could not have stood a plank upon its end against each side of the cut and have dropped another plank or something between them, and he answered, "No, sir." And his testimony proceeds as follows:

"Q. You could stand them up on each side, with the ends on the bottom of the cut? A. Yes, sir. Q. Could you not let down between them a brace, say, 4x4, resting against each board? A. Not without getting in the hole, you could not. * * * Q. Do you not think that * * * you could shove in one end and place the other to where you desire and let it drop? A. It might be done if you had it cut in the proper slope and the cut was just right at that place. Q. I believe you stated that it was not as dangerous to brace the fill as it was to construct the culvert, while you were working in it. I will ask you if you could not brace it from the top? A. Not handy, you could not. * * * They would not hold in that way unless the braces were exactly the right length, and that would take a measurement and you would have to go in the cut to do it. Q. Do you not think that to drop a 2x12, or a 4x4 down between those planks, one of which is lying on one face of the walls and one on the other, and let it catch each of the boards, would have made a·right strong brace for the walls? A. I do not know that I understand your explanation. Q. Well, we will say you have a 1x12 board lying on the face of one wall and you have one lying on the face of the other wall. A. Yes. Q. What is to keep you, without interfering with the walls, from dropping in between the boards, say, a 2x12 or a 4x4 brace, with the ends resting against those planks, one end against one plank and one against the other, letting it go down as far as it ·would go? A. That would be all right if you knew where to cut the brace so as to make it strong and of the right length; but I think, before you got it fastened with anything like security, you would have to go in the cut. Q. Well, if it was 10½ feet wide, would not a 10½-foot brace have held up in it? A. I do not think that there is much in that; I do not think it would stay or be safe unless nailed. Q. Do you not think that a brace of that description would have held the walls? A. I do not think so; I think it would have caved just the same, with that kind of a brace. Q. You think that, if it was going to cave, it would cave anyway? A. Yes. * * * Q. You do not believe in braces? A. I do not believe it is practicable. Q. You have never tried, or seen it tried? A. No, sir; all the men I worked for used a slope. Q. Did they use a slope of 1 foot to the 14 feet deep? A. That depended. I have worked when the walls were perpendicular up and down."

There are ten or a dozen witnesses, most, if not all, of them men who assisted in excavating the cut, who testify that the sides looked straight (meaning perpendicular), to them; and there are about that many who testify that the soil was a mixture of clay, gumbo, gravel, and sand, or clay, gumbo, and

sand, or gumbo, gravel, and sand, or gumbo, dirt, and sand, or gumbo, gravel, clay, and top soil.

Mr. Ball, president of the defendant companies (all of them), says:

"I did not examine closely; was there only one time; that was the day of the accident; I did not examine closely; as I remember it, it was stiff clay and gumbo dirt, with a small per cent. of gravel and sand."

Mr Lewis says that it was red clay and a little sand. Mr. Cobb says that it was yellow pipe clay, gravel, and sand, no gumbo. Some 40 pages farther along, however, he says that there is no difference between red and yellow clay, and that clay is composed of different kinds of dirt, gumbo, gravel, sand, etc., which "makes a strong, hard dirt." Mr. Futrell says that the soil was red clay, sand, and gravel, no gumbo. Most of the witnesses testify that the soil was hard; some that it was very hard; others that it was hard in places and soft in other places. Mr. Cobb is corroborated by one or two witnesses in the statement that he appeared upon the scene of the accident on Wednesday morning, before the others, and inspected the cut, but there were more who testify that they did not see him until after the work had begun, and that they would probably have seen him if he had been there. The same thing may be said about his having staked off the work originally.

One of the witnesses defines gumbo as follows:

"Gumbo soil is very close and sticky when wet, and when dry it is very hard; it is a soft kind of clay that will not easily mix with other soil; it is rather waxy and works about in other dirt, does not mix with it easily. When dry it is very hard, and it takes a pick to break it up; when it is wet it sticks to everything it touches, like wax."

M. F. Stewart and J. J. Burke, called by plaintiff, testified to long experiences in railroad and other work involving the excavation of cuts and ditches, and concurred to the effect that "made earth," such as railway "fill" or embankment, can never be relied on as having acquired the strength and coherency of earth that had been undisturbed; that, in the excavation of a cut such as that in which the accident occurred, the sides should have been given a much greater slope, or else they should have been braced, the latter method being, in the opinion of the witnesses (or one of them), the simpler and better in such case, since the excavation was made merely for a temporary purpose.

Mr. Chenett, called by defendant, has been track and section foreman for many years; has put in and repaired many culverts; the largest was four feet in a fill eight feet deep. He has, however, worked in Alexandria, putting in sewer pipe in ditches, some of which were 22 feet deep, with perpendicular walls; the work was done under the direction of an engineer; the walls were braced in some places and in others they were not; where the braces were not put in the soil was mostly yellow clay. On cross-examination the witness said that he could recall but two culverts that he had put in; most of his railroad work having been track work. The cut here in question having been described to him, he was asked whether the work was properly done without bracing the sides, and his answer was:

"It was constructed properly. I think it could have been constructed with perfect safety with straight walls."

He was then asked:

"In your opinion, was the cut that was made through the fill, as described to you, reasonably safe for the employés to work in?"

To which he answered:

"I think it was so."

### Opinion.

[1, 2] Beginning where the foregoing statement of the case ends, we find it impossible to understand a witness who, knowing that

the side of a ditch which has been excavated, with practically no slope and without bracing, has caved in of its own motion upon the workmen, killing one and injuring others, testifies that the method of excavation was reasonably safe, and equally impossible to understand the point of view from which defendants' counsel contend that a man who has worked on railroads for 20 years without having learned that the sides of a ditch may be kept from caving in by bracing, and who appears to be unable to appreciate that possibility when it is explained to him, is an expert in the science of excavation and a competent person to put in charge of such work. There is no doubt that the bracing of the cut here in question would have saved one human being from death and others from serious injuries, and that all the bracing that was needed could have been done within an hour, at a trifling expense, and without risk to any one; and it is equally beyond doubt, as a legal proposition, that defendants owed it to those whom they employed to provide them with a reasonably safe place in which to do their work, and to exercise reasonable precaution in seeing that the place was kept safe. It is said that the material in which the excavation was made was hard, so hard that it was necessary to use pickaxes in order to disintegrate it; that defendants' representatives did not know, and had no reason to suspect, that it was dangerous material in which to make the excavation with neither slope nor brace; and that they were no more to blame for their ignorance and lack of prevision than were the men and boys employed by them. The ignorance is conceded; but in our opinion it was utterly inexcusable, and the fault of defendants' representatives bears no more relation to that attributed to the laborers employed by them than would the fault of a person, pretending to be an architect, bear to that of the occupants, crushed in the ruins of a house built under his direction and falling upon them because too weak to stand. It was the duty of defendants' representatives to know the character, with reference to its coherency and the intrinsic and extrinsic conditions affecting it, of the conglomerate mass of which the embankment to be excavated was composed, and to know how, properly, to provide against the danger of its disintegration whilst the work of excavation was being carried on; and no such knowledge was to have been expected of the ignorant and inexperienced laborers—men and boys—whom they employed to do that work, as they were directed. The fact that the admixture of which the embankment was composed was so hard, in most places, as to require the use of picks, though soft enough, in others, to admit of the use of shovels, afforded no evidence of its coherency, rather to the contrary; for the whole embankment might have been composed of broken rock or brick so compacted as to require the use of picks, and yet have been wholly incoherent; and upon the other hand, it might have been composed of pure clay, homogeneous throughout, and yet susceptible of excavation by the use of spades. There is, however, no affinity, so far as we are informed by the evidence in the record, between ordinary clay, gravel, and gumbo, and we can readily credit the testimony to the effect that those elements, even with a percentage of sand and top soil added, would be many years (speaking in terms relating to geological formations) in forming a union. The fact appears to be that defendants' representatives, though, no doubt, competent and reliable men, within the limits of their knowledge gained by experience, were placed in charge of work which was just beyond those limits, and, having no other knowledge to fall back on, they were not equal to the occasion. They all testify, in absolute terms, that they do not know, and have no idea whatever, why

the side of the cut caved in. If, however, we are correct in assuming that they found it necessary to raise the roadbed on the top of the embankment, because it had sunk, it appears to us that it would have been natural to deduce that the same cause which produced the depression upon the top must have operated to disintegrate or crack the entire mass. It will be remembered that Mr. Lewis testified that there was nothing on the top of the fill to indicate that the culvert beneath needed repairs, and yet upon being asked:

"For what purpose did you put those timbers under the track?"

—he replied:

"To make safe and protect the engine, cars, and crew in passing over the dumps in case the culvert should give way."

It is quite evident, therefore, that he suspected that there might, perhaps, be some connection between the top of the dump and the bottom, and it appears to us that it occurred to him that such sinking of the top, as had taken place, might be attributable to a sinking of the bottom into the culvert, and that there might be more to come, against which he ought to protect the engine, cars, and crew of the company, in which case he was bound also to have felt or known that the conglomerate of which the dump was composed must be more or less broken and cracked, and hence dangerous for deep excavation, without the exercise of the usual precaution. There is some testimony on behalf of defendant to the effect that, whilst the old culvert was rotten wherever it could be seen at the ends, it was found to be sound in the middle of the dump, but the point appears to have attracted no particular attention, and as new wood was substituted for the old throughout, and the old had been in position for some 12 or 15 years, we apprehend that it was not alto-

gether sound through the middle and may have given way in places, and thereby have permitted a movement in the superincumbent mass sufficient to impair such integrity as it may have acquired. In any event, there was always a box culvert at the bottom of the dump, which may or may not have been open, in the manner of a tile drain, to the receipt of water, and, whether it was thus open or not, it must, from the beginning, have attracted a certain proportion of the water which soaked into and seeped through the dump, and the passages through which that water found its way remained there, grew no smaller, and were there when the cut was excavated to put in the new culvert. The heavy timbers, 12x12, 32 feet long, which supported the ties and track while the roadbed was being raised, were removed after the cut had been excavated, and, as they passed over the cut, the men who handled them, and whilst handling them, were likely to have imposed their own weight and part of the weight of the timbers upon the surface of the dump near the edges of the cut. When, also, the dirt was thrown from the arch upon the surface near the edges of the cut, it was removed by three or four men who were stationed there for that purpose, and whose weight, together with the weight of the dirt, gravel, etc., no doubt contributed to the opening or making of a crack along the side of the cut, which, when the wall lost the support of the arch, opened still wider, and precipitated a portion of the wall upon the laborers who were working below.

Our conclusion from the whole testimony is that, from the character of the material in which the excavation was to be made and the intrinsic and extrinsic conditions, defendants' representatives should have known that the work to which they assigned the plaintiff Carl Watson was unsafe; that he was ignorant of the danger to which he was

subjected, and could not have been expected to know it; and that defendants are liable for the consequences. The J. F. Ball Bro. Lumber Company, Limited, and the Natchez, Ball & Shreveport Railroad Company are, as we have stated, practically owned and wholly controlled by the same people, and the interest of the two companies in the business which is done by them is so entirely in common as to be distinguished only, perhaps, as matter of bookkeeping, and even that distinction is not proved. Mr. Lewis, the "woods foreman" of the lumber company, and the superintendent of the railroad, under whose authority the plaintiff was employed, draws his salary from the lumber company, as do all other persons who do any work for that company or in connection with its road. In view of the difference of opinion between the physicians who have testified in the case, we are unable to determine what effect plaintiff's injuries may have upon his efficiency as a multiplier of his race, and we give the defendants the benefit of the doubt in holding that those injuries will not be more than compensated by an award of $6,000.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment in favor of the plaintiff Carl L. Watson and against the defendants, J. F. Ball Bro. Lumber Company, Limited, and Natchez, Ball & Shreveport Railway Company in solido, in the sum of $6,000, with legal interest thereon from the date of this judgment and all costs.

### On Rehearing.

PER CURIAM. The rehearing is granted in this case solely on the question of the quantum of damages, and the case is remanded for further testimony as to the effect of the injuries sustained by plaintiff, and further proceedings according to law.